UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------------X

SHAKERIA LITTLE, *Individually and as Administrator*
*of the Estate of Antwan Brown, Deceased*

        Plaintiff,    **MEMORANDUM & ORDER**
                14-CV-00125 (JMA) (SIL)

     -against-

COUNTY OF NASSAU, NASSAU COUNTY
CORRECTIONAL CENTER, NASSAU COUNTY
SHERIFF'S DEPARTMENT, CORRECTION OFFICER
 ROBERT LOBOSCO, CORRECTION OFFICER
THOMAS WALLACE, CORRECTION OFFICER
JEFFREY COLLETI, and CORPORAL KEVIN
CZUBAKOWSKI,

        Defendants.
--------------------------------------------------------------------X

**AZRACK, United States District Judge:**

   Presently before the Court is the motion by Defendants County of Nassau ("Nassau County"), Nassau County Correctional Center ("NCCC"), Nassau County Sheriff's Department ("Sheriff's Department"), Correction Officer Robert Lobosco ("Lobosco"), Correction Officer Thomas Wallace ("Wallace"), Correction Officer Jeffrey Colleti ("Colleti"), and Corporal Kevin Czubakowski ("Czubakowski," and together with Lobosco, Wallace, and Colleti, the "Individual Defendants") for summary judgment dismissing this civil rights action pursuant to Federal Rule of Civil Procedure 56.  (ECF No. 114).  Plaintiff Shakeria Little's claims stem from the killing of her brother, Antwan Brown ("Brown"), in the NCCC by another inmate on January 7, 2012.

   For the reasons set forth below, the motion is GRANTED and this action is DISMISSED.

## I.  BACKGROUND

A.  <u>Facts</u>

### 1.  Brown's Arrest and Guilty Plea

On November 25, 2010, Brown was arrested and charged with, among other things, "Assault 2: With Intent To Cause Physical Injury To Officer/Fireman/EMT" in violation of N.Y. PENAL LAW § 120.05-3.  (Plaintiff's Local Civil Rule 56.1 Statement of Material Facts ("Pl. 56.1"), ECF No. 115-17 ¶ 7.)  Following his arrest, Brown was held at the NCCC.  (See id. ¶ 1.)  On January 4, 2012, Brown pled guilty to "attempted assault in the second degree" in violation of PENAL LAW § 110.  (Plea Transcript, ECF No. 114-6 at 2-3, 7-11; see also id. at 10 (Brown's allocution).)  The New York State Supreme Court, Nassau County Criminal Term accepted Brown's plea "in full satisfaction of the entire indictment" and scheduled sentencing for February 6, 2012.  (Id. at 11.)

### 2.  Relevant Histories of Brown and Charles Creekmur Before January 7, 2012

On July 31, 2011 at 8:10 a.m., nonparty Charles Creekmur ("Creekmur"), an inmate at the NCCC, requested to be placed in administrative segregation because he reported that he "ha[d] been threatened by" unidentified Bloods gang members, he was "afraid" of unidentified Bloods gang members, and he "d[id] not want any problems."  (Administrative Segregation Report, ECF No. 115-12 at 2-3.)  While NCCC documents dated January 8, 2012, report that Brown was a Bloods gang member (Gang Intel Report, ECF No. 115-14), Creekmur's request in July 2011 that he be placed in administrative segregation did not mention Brown.  (see generally, Administrative Segregation Report, ECF No. 115-12.)  The NCCC granted Creekmur's request.  (Id.)

On July 31, 2011 at 2:02 p.m., Brown was in an altercation with another inmate, Michael Henney. (Disciplinary Report, ECF No. 115-13; see Defendants' Reply Local Civil Rule 56.1

Statement Of Material Facts ("Def. 56.1"), ECF No. 116-6 ¶ 4 (acknowledging this event).[1])   A nonparty corrections officer observed Brown and Mr. Henney "fighting" and reported that both inmates complied with verbal commands to stop fighting "w[ithout] further incident." (Disciplinary Report, ECF No. 115-13.)  As a result of this event, Brown was deemed a sufficient "threat to safety, security and good order of the facility" to warrant detention prior to the resulting disciplinary hearing.  (Id.)

### 3.   The Killing of Brown on January 7, 2012

On January 7, 2012, the Individual Defendants comprised the four-person correction officer "crew" assigned to the NCCC's Blocks E-1-A and E-1-B.  (Pl. 56.1, ECF No. 115-17 ¶ 16.) Wallace was assigned to Block E-1-A, Lobosco was assigned to Block E-1-B, Colleti was assigned to the control room, and Czubakowski was assigned to oversee both Blocks E-1-A and E-1-B.  (See id. ¶¶ 9-12.)

Block E-1-B contains fifty-two cells, with twenty-six cells on the first floor and twenty-six cells on the second floor.  (Id. ¶ 13.)  On the second floor of that block, Brown was housed in cell thirty-one and Creekmur was housed in cell thirty-three.  (Id. ¶¶ 14-15; Def. 56.1, ECF No. 116-6 ¶ 6).  "Just after 6:00 AM," Czubakowski counted the inmates in their cells.  (Def. 56.1, ECF No. 116-6 ¶ 13.)  Following that count, the cells on one level were opened and inmates were allowed to eat the breakfast served in the common area.  (Pl. 56.1, ECF No. 115-17 ¶ 17.)  When the breakfast line diminished, the cells on the other level were opened.  (Id.)  After the inmates were afforded time to eat breakfast, "the gates [were] 'racked,' which indicated [to] the inmates that they were to return to their cells."  (Id. ¶ 18.)  "Following breakfast, each inmate was to be locked

---

[1]      Paragraph citations to Def. 56.1, ECF No. 116-4 correspond to Defendants' responses to the numbered paragraphs from Plaintiff's counter statement of facts set forth in Pl. 56.1, ECF No. 115-17.

in his cell alone and without any other inmate present in his cell." (Def. 56.1, ECF No. 116-6 ¶ 15.)

Creekmur, however, entered Brown's cell and began to attack Brown shortly before the cell's door closed at approximately 6:45 a.m. (See, e.g., New York State Commission of Correction Final Report, ECF No. 114-14 at ¶ 5 (documenting that Creekmur's "undetected" entrance into Brown's cell allowed the two inmates to be "locked in Brown's cell together" during the attack).) Two inmates attest that the assault continued uninterrupted for several minutes.[2] (See Declaration of Devon A.L. Adams ("Adams Declaration"), ECF No. 115-7 ¶ 17 (reporting that eight to ten minutes passed before corrections officers arrived); Statement from Richard Patterson ("Patterson Statement"), ECF No. 115-15 at 2 (reporting that it was "a while" before corrections officers arrived).[3]) Thereafter, Lobosco, who was on the first floor, "heard inmates yelling[,] . . . went to the second tier of Block B to investigate[,] and signaled to Officer Colleti and Corporal Czubakowski" in the control room for assistance. (Pl. 56.1, ECF No. 115-17 ¶ 19.) Upon his arrival at cell 31, Lobosco observed that Brown and Creekmur were locked in Brown's cell together, Creekmur had Brown in a choke hold, and Creekmur was "hammer-fist[]" punching Brown's head. (Def. 56.1, ECF No. 116-6 ¶ 35.) Lobosco instructed Creekmur to release Brown, but Creekmur refused and continued the attack. (Id.) Lobosco then deployed oleoresin capsicum spray, otherwise known as pepper spray, on Creekmur. (Id.; see Lobosco Dep. Tr., ECF No. 114-

---

[2] Defendants do not counter that the uninterrupted portion of the assault was shorter. (See Def. 56.1, ECF No. 116-6 ¶¶ 32, 46).

[3] The Court accepts the Patterson Statement as sworn because it acknowledges that any false statements therein are punishable under N.Y. PENAL LAW section 210.45. (Patterson Statement, ECF No. 115-15 at 1); see People v. Sincerbeaux, 27 N.Y.3d 683, 688 (2016) (finding statement acknowledging consequences of PENAL LAW § 210.45 was sworn); see also Gelzer v. Fischer, No. 07-CV-2282, 2007 WL 3539598, at *7 (E.D.N.Y. Nov. 14, 2007) (explaining that PENAL LAW § 210.45 allows prosecution for submitting a false written statement even if the statement is not sworn before a judge or a notary).

8 at 73:5-7 (agreeing that the substance is "commonly referred to as pepper spray").)  The parties dispute what happened next.

According to Defendants, the pepper spray "immediately" forced Creekmur to release Brown, Czubakowski arrived "seconds" later, Lobosco stated "we have two guys in there fighting," and Lobosco signaled to the control room to open the cell.  (Lobosco Dep. Tr., ECF No. 114-8 at 72:22-75:6.)  Then, Colleti opened Brown's cell from the control room, alerted Wallace to the situation, and called medical personnel.  (Colleti Dep. Tr., ECF No. 114-9 36:2-25; see Pl. 56.1, ECF No. 115-17 ¶ 26 (Plaintiff agreeing that Colleti called the medical team within 35 seconds of learning about the situation).)  Next, Lobosco and Czubakowski (1) entered the cell, (2) observed Brown breathing on the ground while making "gurgling" noises, (3) took Creekmur, once medical personnel arrived, to "decontaminate" from the pepper spray, (4) moved Creekmur to a cell on Block E-1-A, and (5) returned to Brown's cell on Block E-1-B.  (See Lobosco Dep. Tr., ECF No. 114-8 at 81:4-83:9; Czubakowski Dep. Tr, ECF No. 114-10 at 61:2-25).  Defendants report that these events occurred across approximately two minutes, and that the medical staff's efforts to aid Brown—which involved CPR and a defibrillator—continued thereafter.  (Lobosco Dep. Tr., ECF No. 114-8 at 81:23-83:25.)

According to Adams, an inmate who reportedly saw part of the assault but "could not see it all", Lobosco deploying pepper spray into the cell was "not effective," it took "two to three" additional minutes before NCCC personnel went into the cell and "pulled Creekmur off of Brown," and "between six and ten" additional minutes passed before medical personnel arrived and rendered aid to Brown.  (Adams Decl., ECF No. 115-7 ¶¶ 12, 17-18. But see Patterson Statement, ECF No. 115-15 at 2 (reporting that Creekmur "stopped beating up" Brown when the pepper spray "got into his eyes").)

5

Resuscitation efforts were unsuccessful; Brown died on January 7, 2012 from neck compression sustained from Creekmur's attack.  (Def. 56.1, ECF No. 116-6 ¶ 36.)  On July 10, 2014, Creekmur was convicted of First Degree Manslaughter in violation of PENAL LAW § 125.20 for killing Brown.  (Pl. 56.1, ECF No. 115-17 ¶ 33.)

## B.   **Procedural History**

On January 7, 2014, Plaintiff, who in addition to being Brown's sister is also the administrator of Brown's estate, commenced this civil rights action by filing the Complaint.  (ECF No. 1.)  On May 28, 2015, Plaintiff filed the operative pleading: the Second Amended Complaint ("SAC").  (ECF No. 42.)  The SAC brought the following two causes of action against the instant Defendants under 42 U.S.C. § 1983 ("Section 1983"): (1) violations of the Fourteenth Amendment based on the Individual Defendants' failure to "adequately prevent and respond to" the assault on Brown; and (2) municipal liability under Monell v. Dep't of Soc. Servs. of City of New York, 436 U.S. 658 (1978) and its progeny.[4]  (Id. ¶¶ 58-93).  Plaintiff brought her claims against the Individual Defendants in both their individual and official capacities.  (Id. ¶¶ 14-17.)

On July 22, 2022, Defendants requested a pre-motion conference pursuant to the undersigned's Individual Practice Rules to obtain leave to file the instant motion.  (ECF No. 103.)  After the Court waived its pre-motion conference requirement, adopted the parties' initial proposed briefing schedule, and granted multiple joint requests to extend the briefing schedule (see Orders dated Aug. 22, 2022, Oct. 3, 2022, Dec. 12, 2022, Feb. 13, 2023), briefing for the motion concluded on April 28, 2023.  (ECF Nos. 114-116.)

---

[4]     The SAC also brought negligence and medical malpractice claims against certain additional defendants in connection with the aid provided to Brown after the attack.  (See ECF No. 42 ¶¶ 94-118.)  Those defendants were dismissed with Plaintiff's consent on September 6, 2018.  (ECF No. 80.)

6

## II.   LEGAL STANDARDS

### A.   <u>Summary Judgment</u>

Summary judgment must be granted when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  "An issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  A fact is material if it might affect the outcome of the suit under the governing law." <u>Choi v. Tower Research Capital LLC</u>, 2 F.4th 10, 16 (2d Cir. 2021); <u>see</u> <u>McKinney v. City of Middletown</u>, 49 F.4th 730, 737 (2d Cir. 2022) ("No genuine dispute of material fact exists when the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." (internal quotation marks omitted)).  "The moving party bears the initial burden of showing that there is no genuine dispute as to a material fact." <u>Jaffer v. Hirji</u>, 887 F.3d 111, 114 (2d Cir. 2018) (internal quotation marks omitted).  For any burden of proof that rests with the nonmoving party, the movant can "point[] to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim." <u>Id.</u> (internal quotation marks and alterations omitted).  Once the moving party carries its burden, "the nonmoving party must come forward with evidence that would be sufficient to support a jury verdict in its favor." <u>McKinney</u>, 49 F.4th at 738 (internal quotation marks omitted).  In this analysis, the Court must "construe the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." <u>ING Bank N.V. v. M/V Temara</u>, 892 F.3d 511, 518 (2d Cir. 2018).  Ultimately, "[t]he role of the district court on summary judgment is 'not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried.'" <u>McKinney</u>, 49 F.4th at 738 (quoting <u>Brod v. Omya, Inc.</u>, 653 F.3d 156, 164 (2d Cir. 2011)).

B.      **Section 1983**

"Section 1983 provides a civil claim for damages against any person who, acting under color of state law, deprives another of a right, privilege or immunity secured by the Constitution or the laws of the United States." Thomas v. Roach, 165 F.3d 137, 142 (2d Cir. 1999); see 42 U.S.C. § 1983.  "It is well-settled that § 1983 does not create a federal right or benefit; it simply provides a mechanism for enforcing a right or benefit established elsewhere."  Morris-Hayes v. Bd. of Educ., 423 F.3d 153, 159 (2d Cir. 2005); see Moroughan v. Cnty. of Suffolk, 514 F. Supp. 3d 479, 511 (E.D.N.Y. 2021) (similar).  Accordingly, "[t]he factors necessary to establish a § 1983 violation will vary with the constitutional provision at issue because the elements of different constitutional violations vary."  Tangreti v. Bachmann, 983 F.3d 609, 618 (2d Cir. 2020) (internal quotation marks and alterations omitted); see Albright v. Oliver, 510 U.S. 266, 271 (1994) ("The first step in any [Section 1983] claim is to identify the specific constitutional right allegedly infringed.").

To "establish a defendant's individual liability in a suit brought under § 1983, a plaintiff must show . . . the defendant's personal involvement in the alleged constitutional deprivation." Grullon v. City of New Haven, 720 F.3d 133, 138 (2d Cir. 2013).  To do so, "a plaintiff must plead and prove 'that each Government-official defendant, through the official's own individual actions, has violated the Constitution.'"  Tangreti, 983 F.3d at 618 (quoting Ashcroft v. Iqbal, 556 U.S. 662, 676 (2009)).

A Section 1983 claim against a municipality is governed by Monell v. Dep't of Soc. Servs. of City of New York, 436 U.S. 658 (1978) and its progeny.  "Monell expressly prohibits respondeat superior liability for municipalities . . . meaning that a plaintiff must demonstrate that 'through its deliberate conduct, the municipality was the "moving force" behind the injury alleged.'"  Agosto

v. N.Y.C. Dep't of Educ., 982 F.3d 86, 97-98 (2d Cir. 2020) (quoting Bd. of the Cty. Comm'rs v. Brown, 520 U.S. 397, 404 (1997)).  "The elements of a Monell claim are (1) a municipal policy or custom that (2) causes the plaintiff to be subjected to (3) the deprivation of a constitutional right." Id. at 97; see Frost v. New York City Police Dep't, 980 F.3d 231, 257 (2d Cir. 2020).

### III.   DISCUSSION

#### A.   The Claims Against The NCCC, Sheriff's Department, and Individual Defendants in Their Official Capacities Must Be Dismissed

Defendants contend that the NCCC and Sheriff's Department must be dismissed as non-suable entities, and the official capacity claims against the Individual Defendants must be dismissed as redundant to the claims against Nassau County.  (See Defendants' Memorandum Of Law ("Def. Mem."), ECF No. 114-16 at 13-15).  Plaintiff failed to respond to those arguments. (See generally, Plaintiff's Opposition Memorandum Of Law ("Opp."), ECF No. 115-18.)  Courts may "infer from a party's partial opposition [to summary judgment] that relevant claims or defenses that are not defended have been abandoned."  Jackson v. Fed. Express, 766 F.3d 189, 198 (2d Cir. 2014).  Accordingly, Plaintiff abandoned those claims.  See id. at 196-97 (affirming dismissal of claims as abandoned during summary judgment briefing); Malik v. City of N.Y., 841 F. App'x 281, 284 (2d Cir. 2021) (similar).

Even if Plaintiff had not abandoned them, the claims against the NCCC and Sheriff's Department must be dismissed.  "Under New York law, departments that are merely administrative arms of a municipality do not have a legal identity separate and apart from the municipality and, therefore, cannot sue or be sued."  E.g., Rose v. Cnty. of Nassau, 904 F. Supp. 2d 244, 247 (E.D.N.Y. 2012).  For that reason, "[i]t is well established" that Plaintiff cannot maintain her claims against the NCCC and the Sheriff's Department.  Gazzola v. Cnty. of Nassau, No. 16-CV-0909,

2022 WL 2274710, at *15 (E.D.N.Y. June 23, 2022); Gleeson v. Cnty. of Nassau, No. 15CV6487, 2019 WL 4754326, at *14 (E.D.N.Y. Sept. 30, 2019).

Likewise, even if Plaintiff had not abandoned them, the claims against the Individual Defendants in their official capacities must be dismissed. "[A]n official-capacity suit against a municipal official 'is, in all respects other than name, to be treated as a suit against the governmental entity.'" Quinones v. City of Binghamton, 997 F.3d 461, 466 n.2 (2d Cir. 2021) (quoting Kentucky v. Graham, 473 U.S. 159, 166 (1985)) (internal alterations omitted). For that reason, "[w]ithin the Second Circuit, where a plaintiff names both the municipal entity and an official in his or her official capacity, district courts have consistently dismissed the official capacity claims as redundant." Phillips v. Cnty. of Orange, 894 F. Supp. 2d 345, 385 n.35 (S.D.N.Y. 2012) (collecting cases). Thus, "because the County is named in the [SAC], the claims against [the Individual Defendants] in their official capacities must be dismissed as duplicative and redundant." Stancati v. Cnty. of Nassau, No. 14-CV-2694, 2015 WL 1529859, at *2 (E.D.N.Y. Mar. 31, 2015); see Gleeson, 2019 WL 4754326, at *13 n.21 (similar); Reid v. Nassau Cnty. Sheriff's Dep't, No. 13–CV–1192, 2014 WL 4185195, at *11 (E.D.N.Y. Aug. 20, 2014) (similar).

**B.** **Brown was Protected By The Fourteenth Amendment on January 7, 2012**

The parties dispute whether, when he was killed, Brown was protected by the Fourteenth Amendment or the Eighth Amendment. See Darby v. Greenman, 14 F.4th 124, 128 (2d Cir. 2021) (describing the differences in how these Amendments apply and their standards for challenging conditions of confinement). Defendants contend that Brown was subject to the Eighth Amendment on January 7, 2012 because he pled guilty three days earlier. (Def. Mem., ECF No. 114-16 at 3-4.) Defendants argue that Plaintiff's claims for violations of the Fourteenth Amendment must therefore be dismissed. (Id.) Plaintiff counters that her Fourteenth Amendment claims are proper

10

because Brown, though convicted, was never sentenced.  (Opp., ECF No. 115-18 at 2-3); see also Darby, 14 F.4th at 128 (explaining that, before the Eighth Amendment applies, the Fourteenth Amendment provides due process rights that "are at least as great as" Eighth Amendment protections (internal quotation marks omitted)).

The Court agrees with Plaintiff that Brown was subject to Fourteenth Amendment protections on January 7, 2012.  The Supreme Court has long held that "the Eighth Amendment's protections d[o] not attach until after conviction and sentence." Graham v. Connor, 490 U.S. 386, 392 n.6 (1989) (emphasis added); see also Adamson v. Miller, 808 F. App'x 14, 19 n.3 (2d Cir. 2020) (same); United States v. Walsh, 194 F.3d 37, 47 (2d Cir. 1999) (same).  Accordingly, the Court will not dismiss Plaintiff's claims for Fourteenth Amendment violations on the ground that Brown was instead subject to the Eighth Amendment.[5]

## C.    The Fourteenth Amendment Failure To Protect Claims Fail

"[P]rison officials have a duty to protect prisoners from violence at the hands of other prisoners." Walker v. Schult, 717 F.3d 119, 128 (2d Cir. 2013) (quoting Farmer v. Brennan, 511 U.S. 825, 833 (1994)).  Not every injury suffered by one inmate at the hands of another imposes constitutional liability on officials responsible for the victim's safety.  Farmer, 511 U.S. at 834. Rather, an official must act with "deliberate indifference to a substantial risk of serious harm to an inmate." Id. at 828.

A plaintiff must make two showings to prove a deliberate-indifference claim under the Fourteenth Amendment, including when invoking a theory of failure to protect against (i.e.,

---

[5]      Defendants erroneously argued that this Court "recently found" that "upon a plea of guilty, the Fourteenth Amendment is inapplicable."  (Def. Mem., ECF No. 114-16 at 4 (citing Neira v. Cnty. of Nassau, No. 13-CV-07271, 2022 WL 4586045, at *15 n.15 (E.D.N.Y. Sept. 29, 2022)).)  On the contrary, the undersigned did not determine when the Eighth Amendment applied in Neira; the undersigned noted there that the plaintiff's claims failed under both the Fourteenth and Eighth Amendment standards.  See 2022 WL 4586045, at *15 n.15.

prevent) an inmate attack.  The first is "an 'objective prong' showing that the challenged conditions were sufficiently serious to constitute objective deprivations of the right to due process."  Darnell v. Pineiro, 849 F.3d 17, 29 (2d Cir. 2017).  The second is "a 'subjective prong' . . . showing that the officer acted with at least deliberate indifference to the challenged conditions."  Id.  Defendants assert that Plaintiff put forth no admissible evidence to support either showing on a failure to protect claim.  (Def. Mem., ECF No. 114-16 at 6.)  The Court agrees with Defendants.

### 1.    Plaintiff Failed To Satisfy the Objective Prong

To establish an objective deprivation, Plaintiff "must show that the conditions, either alone or in combination, pose[d] an unreasonable risk of serious damage to [Brown's] health."  Darnell, 849 F.3d at 30 (quoting Walker, 717 F.3d at 125).  In other words, the conditions must pose a "substantial risk of serious harm."  Lewis v. Siwicki, 944 F.3d 427, 431 (2d Cir. 2019) (applying objective prong in Eighth Amendment context); see also Darnell, 849 F.3d at 30 (explaining that the objective prong is the same under the Eighth and Fourteenth Amendments).  There is no "static test" to determine whether a deprivation is sufficiently serious; instead, "the conditions themselves must be evaluated in light of contemporary standards of decency."  Darnell, 849 F.3d at 30 (quoting Blissett v. Coughlin, 66 F.3d 531, 537 (2d Cir. 1995)); Walker, 717 F.3d at 125 (quoting Jabbar v. Fischer, 683 F.3d 54, 57 (2d Cir. 2012)).  In cases brought under a failure to protect theory, "it does not matter . . . whether a prisoner faces an excessive risk of attack for reasons personal to him or because all prisoners in his situation face such a risk."  Farmer, 511 U.S. at 843.  Thus, "a plaintiff may satisfy the objective element by showing either a substantial risk of harm from 'a specific assailant' or 'a more general risk of harm due to the conditions at the time of the attack.'"  Ataroua v. Tamir, No. 22-CV-10371, 2023 WL 2216139, at *3 (S.D.N.Y. Feb. 22, 2023) (quoting Hurst v. Perez, No. 15-CV-4703, 2017 WL 187532, at *2 (S.D.N.Y. Jan. 13, 2017)).

12

Plaintiff asserts (without citing supporting case law) that "the loss of one's life, as in this case, is a sufficiently serious deprivation" to satisfy the objective prong.  (Opp., ECF No. 115-18 at 4.)  Some courts in this Circuit have found that suffering severe injuries independently satisfies the objective prong.  See Gordon v. Drummond, No. 19-CV-8405, 2021 WL 5314604, at *7 (S.D.N.Y. Nov. 16, 2021) (collecting cases), report and recommendation adopted, 2022 WL 884971 (S.D.N.Y. Mar. 25, 2022).  The undersigned, however, agrees with the many courts in this Circuit that held "the focus of inquiry must be, not the extent of the physical injuries sustained in an attack, but rather the existence of a 'substantial risk of serious harm.'"  Heisler v. Kralik, 981 F. Supp. 830, 837 (S.D.N.Y. 1997) (quoting Wilson v. Seiter, 501 U.S. 294, 298 (1991)), aff'd, 164 F.3d 618 (2d Cir. 1998); e.g., Walker v. George, No. 21-CV-6070, 2022 WL 2290634, at *5 (S.D.N.Y. June 24, 2022) (same).  To accept that the mere occurrence of a serious harm satisfies the objective prong of a claim for failure to protect against an inmate attack would eschew determining whether "the risk" of such an attack and resulting injuries "was substantial."  Lewis, 944 F.3d at 432 (emphasis added).  To be sure, the Second Circuit has made clear that part of what must "be[] assessed" is the "variable concept" of "risk."  Id.; see also id. at 431-33 (accepting that a slash to the face was a serious harm and separately analyzing whether the risk of that harm was substantial).  Accordingly, this Court will evaluate the existence of a substantial risk of serious harm from the assailant and general circumstances at the time of the attack.  See, e.g., Ataroua, 2023 WL 2216139, at *3; Hurst, 2017 WL 187532, at *2.

a.   Plaintiff Put Forth no Evidence That Brown Faced a Substantial Risk of Serious Harm From Creekmur

"Courts may find a substantial risk of serious harm where there is evidence of a previous altercation between a plaintiff and his attacker, coupled with a complaint by the plaintiff regarding the altercation or a request by the plaintiff to be separated from the attacker."  Colds v. Smyth, No.

22-CV-2023, 2023 WL 6258544, at *6 (S.D.N.Y. Sept. 26, 2023) (quoting <u>Dietrich v. County of Orange</u>, No. 19-CV-10485, 2020 WL 5209816, at *3 (S.D.N.Y. Sept. 1, 2020)).  The evidence Plaintiff put forth cannot substantiate this showing.

Plaintiff contends that "some type of conflict" occurred on January 6, 2012 between Brown and Creekmur on a handball court.  (Def 56.1, ECF No. 116-6 ¶ 8.)  Plaintiff supports that vague assertion with notes from the police investigation into Brown's death, which summarize dozens of inmate interviews ("Inmate Interview Notes").  (<u>Id.</u> (citing Inmate Interview Notes, ECF No. 115-5).)  "Police reports contain double hearsay—i.e., the first level being the report itself, and the second level the hearsay in the document.  Double hearsay is admissible if each level of hearsay satisfies a hearsay exception."  <u>Hardy v. Adams</u>, 654 F. Supp. 3d 159, 172 (N.D.N.Y. 2023) (quoting <u>United States v. Carneglia</u>, 256 F.R.D. 384, 392 (E.D.N.Y. 2009)); see <u>United States v. Bortnovsky</u>, 879 F.2d 30, 34 (2d Cir. 1989) (holding that a party must establish that both a report and the third-party statements recounted therein fall within a hearsay exception).  "[A]t summary judgment, the 'proponent of an out-of-court statement [offered for its truth] bears the burden of proving it fits into a hearsay exception.'"  <u>Great Lakes Reinsurance (UK) SE v. Herzig</u>, No. 16-CV-9848, 2023 WL 4266012, at *5 (S.D.N.Y. June 29, 2023) (quoting <u>Evans v. Port Auth. of New York & New Jersey</u>, 192 F. Supp. 2d 247, 263 n.121 (S.D.N.Y. 2002)) (internal alterations omitted).  Plaintiff, however, offers no reason why she should be able to rely on the hearsay statements in the Inmate Interview Notes.  (<u>See</u> Opp., ECF No. 115-18 at 15 (discussing Inmate Interview Notes).)  As such, the Court disregards those inadmissible hearsay statements.  <u>See</u> <u>Delaney v. Bank of Am. Corp.</u>, 766 F.3d 163, 169-70 (2d Cir. 2014) (affirming refusal to consider document on summary judgment because it contained "inadmissible hearsay—an out-of-court statement that [plaintiff] would rely on to show the truth of the matter asserted"); <u>United States v. Scali</u>, No. 16-CR-466,

14

2018 WL 604852, at *3 (S.D.N.Y. Jan. 29, 2018) (finding that third-party statements recounted in law enforcement notes were inadmissible hearsay), aff'd, 820 F. App'x 23 (2d Cir. 2020); Brown v. Pagan, No. 08-CV-8372, 2010 WL 1430702, at *1 (S.D.N.Y. Apr. 8, 2010) (declining to admit certain statements recounted in a police report absent an applicable hearsay exception).

Similarly, Plaintiff relies on the portion of the Adams Declaration asserting that Creekmur wanted to injure Brown because the latter called the former a "faggot" on January 6, 2012. (Opp., ECF No. 115-18 at 16.) These statements too are based on hearsay. Adams admits he "became aware" of that reported verbal exchange "through conversations" with others (Adams Decl., ECF No. 115-7 ¶¶ 4-7). Again, Plaintiff provides no argument that the statements made to Adams reporting this event fall into a hearsay exception. (See Opp., ECF No. 115-18 at 16); Herzig, 2023 WL 4266012, at *5; Evans, 192 F. Supp. 2d at 263 n.121. Accordingly, the Court disregards this portion of the Adams Declaration.[6] See FED. R. CIV. P. 56(e) (requiring affidavits submitted on summary judgment to be based on "personal knowledge" and set forth facts "as would be admissible in evidence" to which the affiant could competently testify); Major League Baseball Properties, Inc. v. Salvino, Inc., 542 F.3d 290, 310 (2d Cir. 2008) (holding that "[h]earsay testimony that would not be admissible if testified to at the trial may not properly be set forth in [an] affidavit" on summary judgment (internal quotation marks omitted)); Amnesty Am. v. Town of W. Hartford, 361 F.3d 113, 131 n.12 (2d Cir. 2004) (similar).

---

[6]     In any event, the reported "verbal statements alone do not indicate a substantial threat of serious harm." Dennis v. Westchester Cnty. Jail Corr. Dep't, 485 F. App'x 478, 481 (2d Cir. 2012) (internal quotation marks omitted) (addressing inmate calling another inmate a "faggot"); see Hines v. Lacy, 189 F.3d 460, No. 98–2961, 1999 WL 642915, at *3 (2d Cir. Aug. 20, 1999) (summary order) ("Hines's sketchy description of a verbal confrontation does not sufficiently allege conditions posing a substantial risk of serious harm . . . ." (internal quotation marks omitted)); Ewers v. City of New York, No. 17-CV-1116, 2021 WL 2188128, at *6 (S.D.N.Y. May 28, 2021) (similar), motion for relief from judgment denied, 2023 WL 1869036 (S.D.N.Y. Feb. 9, 2023).

Accordingly, Plaintiff offered no admissible evidence showing a previous altercation between Brown and Creekmur.[7] See McDaniel v. City of New York, No. 19-CV-8735, 2022 WL 421122, at *9 (S.D.N.Y. Jan. 11, 2022) (dismissing failure to protect claims because plaintiff failed to "establish[] a previous altercation with" the assailant); report and recommendation adopted, 2022 WL 421122 (S.D.N.Y. Feb. 11, 2022); Ewers, 2021 WL 2188128, at *6  (similar); James v. Orange Cnty. Corr. Facility, No. 09-CV-7226, 2011 WL 5834855, at *6 (S.D.N.Y. Nov. 18, 2011) (similar).

Finally, even assuming for the sake of argument that Plaintiff provided evidence of a prior altercation between Brown and Creekmur, Plaintiff still failed to offer evidence showing that Brown complained about any such altercation or otherwise requested to be separated from Creekmur.[8] See Colds, 2023 WL 6258544, at *7 (finding no serious risk of harm from an attacker where plaintiff had not previously "told anyone about the threats or otherwise made a complaint"); Leckie v. City of New York, No. 18-CV-3917, 2021 WL 84234, at *5 (E.D.N.Y. Jan. 11, 2021) (granting summary judgment dismissing failure to protect claim where plaintiff had not previously "complained about his attackers" or "raised concerns about his safety"); McDaniel, 2022 WL 421122, at *9 (similar).

---

[7]     The evidence showing that Brown, the victim, had previously been in a fight and was a gang member does not indicate that Creekmur, the perpetrator, posed a risk of harm to Brown.  See Williams v. Salvucci, No. 20-CV-5098, 2022 WL 17586326, at *9 (S.D.N.Y. Dec. 12, 2022) ("[A]n inmate's own violent tendencies are not the type of 'substantial risk of serious harm' protected by the Constitution." (quoting Louis-Charles v. Courtwright, No. 11-CV-147, 2014 WL 457951, at *6 (N.D.N.Y. Feb. 4, 2014) (collecting cases))).  Even if the same attributes instead applied to Creekmur, they would not be independently sufficient to show that Creekmur posed a substantial risk of serious harm to Brown.  See Dietrich, 2020 WL 5209816, at *3 (finding allegations that assailant was a dangerous, combative, gang member known as a violent offender who instigated inmate fights were insufficient to allege a substantial risk of serious harm); Smolen v. Brown, No. 18-CV-7621, 2020 WL 1233762, at *4 (S.D.N.Y. Mar. 13, 2020) (similar); Thomas v. Demeo, No. 15-CV-9559, 2017 WL 3726759, at *8 (S.D.N.Y. Aug. 28, 2017) (similar).

[8]     The evidence most closely related to this point is that Creekmur, the perpetrator, complained about threats from unidentified Bloods gang members and opted to enter administrative segregation on July 31, 2011.  (See Administrative Segregation Report, ECF No. 115-12).

      b.     <u>Plaintiff Put Forth No Evidence Of A Substantial General Risk Of Serious Harm</u>

A sufficient general risk of harm exists where "a substantial risk of inmate attacks was longstanding, pervasive, [or] well-documented."  <u>Farmer</u>, 511 U.S. at 842.  Thus, relying on a general risk of harm requires a showing "of a history of prior inmate-on-inmate attacks similar to the one suffered by the plaintiff and that the measures th[at] should have taken in response to such prior attacks would have prevented the attack on the plaintiff."  <u>Parris v. N.Y. State Dep't Corr. Servs.</u>, 947 F. Supp. 2d 354, 363 (S.D.N.Y. 2013).  According to Plaintiff, a general risk of harm existed because the Individual Defendants failed to perform a post-breakfast inmate count before closing the cells, and the Individual Defendants otherwise failed to prevent Creekmur from entering Brown's cell.[9]  (<u>See</u> Opp, ECF No. 115-18 at 5-11.)  Plaintiff's reliance on those facts is misplaced.  Plaintiff cannot establish  that a general substantial risk of harm existed at the relevant time because she offers no evidence of a history of similar attacks.  <u>See</u> <u>Parris</u>, 947 F. Supp. 2d at 363 (finding no general risk of harm given the lack of any "history of serious inmate-on-inmate assaults in the six block yard . . . or that such prior assaults were similar enough to the attack [plaintiff] suffered that remedial actions would have prevented that attack"); <u>Dietrich</u>, 2020 WL 5209816, at *3 (finding one prior attack on an unspecified date "falls far short of the longstanding, pervasive, well-documented history of similar attacks necessary to state a failure-to-protect claim based on a general risk of harm" (internal quotation marks omitted)).

---

[9]      The Individual Defendants acknowledge that they do not always verify that inmates are in their cells prior to the post-breakfast closing of the cell doors.  (<u>See</u> Lobosco Dep. Tr., ECF No. 114-8 at 53:8-54:23).  Instead, the Individual Defendants reportedly conduct patrols every thirty minutes.  (<u>See</u> <u>id.</u> at 26:25-27:21; Wallace Dep. Tr., ECF No. 114-7 at 56:7-57:2.)

### 2.    Plaintiff Failed to Satisfy the Subjective Prong

Even assuming Plaintiff could satisfy the objective prong, her failure to protect claim would fail on the subjective prong.  To establish the necessary subjective showing under the Fourteenth Amendment, i.e. show deliberate indifference, Plaintiff must prove that a given Individual Defendant "recklessly failed to act with reasonable care to mitigate the risk that the condition posed to [Brown] even though the defendant-official knew, or should have known, that the condition posed an excessive risk to health or safety." Darnell, 849 F.3d at 35.  Though called the "subjective prong," this determination "is defined objectively" and "can be violated when an official does not have subjective awareness that the official's acts (or omissions) have subjected the pretrial detainee to a substantial risk of harm." Id.

"As a general matter, surprise attacks do not suggest deliberate indifference by a corrections officer." Licari v. Toulon, No. 22-CV-00148, 2022 WL 493210, at *5 (E.D.N.Y. Feb. 17, 2022) (internal quotation marks omitted); see Rivera v. Royce, No. 19-CV-10425, 2021 WL 2413396, at *8 (S.D.N.Y. June 11, 2021) ("It is well-established that prison officials cannot be deliberately indifferent to a surprise attack.").  Plaintiff seeks to avoid that principle by arguing that the attack was not a surprise.  To that end, Plaintiff asserts that (1) Plaintiff's expert, Gary Raney, concluded that the Individual Defendants failed to sufficiently monitor and separate Creekmur and Brown, (2) the Inmate Interview Notes and the Adams Declaration show Creekmur and Brown had prior verbal altercations, and (3) several minutes elapsed between Creekmur commencing the attack and Lobosco arriving on scene.  (Opp., ECF No. 115-18 at 13-17.)

None of those arguments undermine that the attack was a surprise. ***First***, Raney's expert report is unsworn (see ECF No. 115-6) and it is undisputed that Raney did not later swear to the contents of the report (see Defendants' Reply Memorandum Of Law ("Reply Mem."), ECF No.

116-7 at 12), meaning the report "is inadmissible and cannot be considered on summary judgment."[10] Fed. Trade Comm'n v. RCG Advances, LLC, ___ F. Supp. 3d___, No. 20-CV-4432, 2023 WL 6281138, at *12 n.8 (S.D.N.Y. Sept. 27, 2023); see Condoleo v. Guangzhou Jindo Container Co., 427 F. Supp. 3d 316, 330 (E.D.N.Y. 2019) ("Courts in this Circuit have uniformly held that unsworn expert reports do not satisfy the admissibility requirements of Fed. R. Civ. P. 56(e), and cannot be used [on] a motion for summary judgment without additional affidavit support."), report and recommendation adopted, 427 F.Supp.3d 316 (E.D.N.Y. 2019).  **_Second_**, the Inmate Interview Notes and relevant portion of the Adams Declaration are inadmissible hearsay that cannot be considered.[11]  (See supra Part III.C.1.a).  **_Third_**, whether several minutes elapsed between the time the attack began and the time Lobosco arrived to it does not undermine that—as Plaintiff acknowledges—Lobosco was unaware that Creekmur entered Brown's cell until Lobosco went there upon hearing inmates screaming.  (Pl. 56.1, ECF No. 115-17 ¶ 19; Def. 56.1, ECF No. 116-6 ¶ 29; see also Lobosco Dep. Tr., ECF No. 114-8 at 70:2-3 ("[A]fter I heard [screaming] I responded as fast as I can.")).  The argument that "intervention was delayed" in response to a sudden inmate attack "does not tend to demonstrate that [corrections officers] knew of and

---

[10]    Considering the substance of the report would not move the needle.  Even if it were true that the NCCC and Lobosco's purported failures to follow NCCC rules and generally accepted jail practices means they "could have done things that would have interrupted Creekmur's plans and potentially prevented the homicide" (Raney Expert Report, ECF No. 115-6 at 13-15), that conclusion does not support that any Individual Defendant "knew, or should have known" that Creekmur "posed an excessive risk to [Brown's] health or safety."  Darnell, 849 F.3d at 35.  Indeed, the failure to man a security post and notice an inmate assault is nonactionable mere negligence.  See Parris, 947 F. Supp. 2d at 364; Dietrich, 2020 WL 5209816, at *4; Fernandez v. New York City Dep't of Correction, No. 08-CV-4294, 2010 WL 1222017, at *4 (S.D.N.Y. Mar. 29, 2010).  Similarly, failing to follow jail rules "does not rise to the level of a constitutional violation." Charles v. Rockland Cnty. Off. of the Sheriff, No. 16-CV-166, 2019 WL 1299804, at *4 (S.D.N.Y. Mar. 21, 2019); see House v. City of New York, No. 18-CV-6693, 2020 WL 6891830, at *17 (S.D.N.Y. Nov. 24, 2020) (similar).

[11]    Even if their substance is considered, the Inmate Interview Notes and Adams Declaration do not show that the Individual Defendants knew or should have known about any prior altercations between Brown and Creekmur, let alone an incident that could show Creekmur posed a substantial risk of harm to Brown.  (See Inmate Interview Notes, ECF No. 115-5; Adams Decl., ECF No. 115-7.)

disregarded a substantial risk of harm to [the victim] <u>before</u> the altercation at issue occurred." <u>Stewart v. Schiro</u>, No. 13-CV-3613, 2015 WL 1854198, at *8 (E.D.N.Y. Apr. 22, 2015); <u>see Parris</u>, 947 F. Supp. 2d at 364 (finding that responding to an attack despite failing to notice it "for several minutes" does not constitute deliberate indifference).

Accordingly, Plaintiff identifies no evidence in the record that would allow a reasonable jury to find that the Individual Defendants should have known Brown faced an impending attack from Creekmur (or any other inmate).  <u>See House</u>, 2020 WL 6891830, at *16 (dismissing failure to protect claims for lack of evidence defendant should have known about the attack); <u>Charles</u>, 2019 WL 1299804, at *4 (same); <u>Gordon</u>, 2021 WL 5314604, at *10 (recommending dismissal under these circumstances); <u>see also Carrasco v. Annucci</u>, No. 17-CV-9643, 2020 WL 5038561, at *3 (S.D.N.Y. Aug. 26, 2020) ("Courts routinely deny deliberate indifference claims based upon surprise attacks." (internal quotation marks omitted)).

## D.  **The Fourteenth Amendment Failure To Intervene Claims Are Deficient**

Defendants assert that Plaintiff similarly put forth no evidence that could substantiate the failure to intervene claim.  (<u>See</u> Def. Mem., ECF No. 114-16 at 4-9.)  The Court again agrees with Defendants.

"Allowing an attack on an inmate to proceed without intervening is a constitutional violation in certain circumstances."  <u>Rosen v. City of New York</u>, 667 F. Supp. 2d 355, 359 (S.D.N.Y. 2009); <u>see Davidson v. Cannon</u>, 474 U.S. 344, 348 (1986) (recognizing a constitutional violation lies "where officials simply stood by and permitted the attack to proceed").  "[F]ailing to intervene is a Fourteenth Amendment violation where the officer acted with 'deliberate indifference to a substantial risk of serious harm to an inmate.'"  <u>Rosen</u>, 667 F. Supp. 2d at 359–60 (quoting <u>Farmer</u>, 511 U.S. at 828).  The standard applied above to the claims for deliberate

indifference in failing to protect against (i.e. prevent) Creekmur's attack likewise applies to the claims for deliberate indifference in failing to intervene in the attack once it commenced.  See Darnell, 849 F.3d at 33 n.9 ("[D]eliberate indifference means the same thing for each type of claim under the Fourteenth Amendment.").   Once it commenced, Creekmur's attack that involved ultimately fatal striking and choking posed a substantial risk of serious harm satisfying the objective prong of the failure to intervene analysis.  See Blake v. Sexton, No. 12-CV-7245, 2016 WL 1241525, at *4 (S.D.N.Y. Mar. 24, 2016) (finding inmate attack involving punches to the skull satisfied the objective prong of a failure to intervene claim).

Nonetheless, the Court concludes Plaintiff has not put forth evidence that could satisfy the second element, which requires showing that the Individual Defendants were at least deliberately indifferent to the risk posed by that attack.  See Darnell, 849 F.3d at 29.  "In the context of a failure to intervene claim, an officer displays deliberate indifference when he has adequate time to assess a serious threat against an inmate and a fair opportunity to protect the inmate without risk to himself, yet fails to intervene."  Leckie, 2021 WL 84234, at *5 (quoting Rosen, 667 F. Supp. 2d at 360).  This requires Plaintiff to show that the Individual Defendants "observed or had reason to know" about the ongoing attack and "had an extended opportunity to stop the attack but failed to take any action to do so."  Fredricks v. Parrilla, No. 20-CV-5738, 2022 WL 3053654, at *11 (S.D.N.Y. Aug. 3, 2022) (internal quotation marks omitted); Stewart, 2015 WL 1854198, at *8 (internal quotation marks omitted).  Plaintiff's failure to intervene claim fails because "[n]othing in the record indicates that the [Individual] Defendants failed to intervene in the incident, let alone

that they did so with deliberate indifference."[12]  McDaniel, 2022 WL 421122, at *10 (dismissing

failure to intervene claim where, as here, the undisputed facts showed that correction officers

responded to an inmate attack by "attempting to restrain [the assailant], requesting back up

assistance, and separating [the involved inmates]"); see Fredricks, 2022 WL 3053654, at *11

(similar); Leckie, 2021 WL 84234, at *5 (similar).

## E.    Municipal Liability Is Unavailable

Where, as here, a plaintiff brings a Section 1983 claim against both a municipality and the

municipal actors alleged to have committed the underlying constitutional tort, the plaintiff's failure

to show that the municipal actors committed the underlying constitutional tort "preclude[s] a

judgment against the municipality." Askins v. Doe, 727 F.3d 248, 253 (2d Cir. 2013).  As explained

above, a reasonable jury could not find for Plaintiff on her claims that the Individual Defendants

violated Brown's Fourteenth Amendment rights.  See supra Parts III.C, III.D.  Accordingly,

Plaintiff's claim for municipal liability must be dismissed.  See Goe v. Zucker, 43 F.4th 19, 34 (2d

Cir. 2022) (affirming dismissal of Monell claim for lack of an underlying constitutional violation

by the individual defendants); Anilao v. Spota, 27 F.4th 855, 874 (2d Cir. 2022) (same); Matican

v. City of N.Y., 524 F.3d 151, 159 (2d Cir. 2008) (same).

---

[12]    Plaintiff insists that that the time reported in the Adams Declaration between Creekmur commencing the attack and Lobosco arriving on scene reflects deliberate indifference in failing to intervene in the assault.  (See Opp., ECF No. 115-18 at 17-18).  Not so.  The Adams Declaration states, consistent with Lobosco's testimony, that corrections officers responded to "yells and screams" from Creekmur and various "other detainees" arising from the assault.  (Adams Decl., ECF No. 115-7 ¶¶ 16-17; see Lobosco Dep. Tr., ECF No. 114-8 at 64:21-70:9.)  The Adams Declaration further explained that the corrections officer response was delayed because, in that chaos, "[t]he officers appeared to have no clue where the screaming was coming from."  (Adams Decl., ECF No. 115-7 ¶ 17.)  The undisputed effort to respond to the screams caused by the assault (see Pl. 56.1, ECF No. 115-17 ¶ 19), even if delayed by the need to locate the sources and causes of those screams, followed by the undisputed efforts to stop Creekmur's attack are inconsistent with deliberate indifference.  See Parris, 947 F. Supp. 2d at 364 (finding the failure to man a security post and notice an inmate assault for "several minutes" before responding to it was nonactionable "mere negligence").

## F.      Qualified Immunity Need Not Be Addressed

In addition to their merits-based arguments, Defendants contend that Plaintiff's claims are barred by qualified immunity.  (See Def. Mem. at 16-20.)  Because Defendants showed that they are entitled to summary judgment, the Court need not address the issue of qualified immunity.  See, e.g., Kee v. City of New York, 12 F.4th 150, 161 n.12 (2d Cir. 2021) (declining to consider qualified immunity because no constitutional violation occurred).

## G.      Plaintiff Erroneously Requests That the Court Exercise Jurisdiction Over State Law Claims

Plaintiff asked the Court to "exercise pendent jurisdiction over the Plaintiff's state law claims."  (Opp., ECF No. 115-18 at 25).  But the only state law claims asserted in the SAC were the negligence and medical malpractice claims against defendants who have since been dismissed. (See SAC, ECF No. 42 ¶¶ 104-118; Order Dismissing Parties, ECF No. 80.)  Thereafter, Plaintiff's only remaining claims were the Section 1983 claims against the instant Defendants. (See SAC, ECF No. 42 ¶¶ 58-93; see also Reply Mem., ECF No. 116-7 at 1 ("Plaintiff does not assert any state law claims . . . .").)  Thus, there are no state law claims over which this Court may exercise jurisdiction.[13]

---

[13]      The Court would decline to exercise jurisdiction over additional state law claims even if the SAC asserted them. A district court "may decline to exercise supplemental jurisdiction over" a state-law claim if, as here, it "has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). Thus, "after properly granting summary judgment on [federal] claims, the District Court ha[s] discretion not to exercise supplemental jurisdiction over the state law claims." Boyd v. J.E. Robert Co., 765 F.3d 123, 126 (2d Cir. 2014); see Souza v. Exotic Island Enters., 68 F.4th 99, 123 (2d Cir. 2023) (reaffirming this principle).  In considering that discretion, district courts balance "values of judicial economy, convenience, fairness, and comity." Klein & Co. Futures, Inc. v. Bd. of Trade of the City of N.Y., 464 F.3d 255, 262 (2d Cir. 2006).  Those factors would weigh against exercising supplemental jurisdiction over additional state law claims here.  See, e.g., Boyd, 765 F.3d at 126 (affirming district court's refusal to exercise supplemental jurisdiction over state law claims after granting summary judgment dismissing all federal claims); Hu v. City of New York, No. 22-183, 2023 WL 3563039, at *3 (2d Cir. May 19, 2023) (same).

## IV.    CONCLUSION

For the reasons stated above, Defendants' motion for summary judgment is GRANTED

and this action is DISMISSED.  The Clerk of the Court is respectfully directed close this case.

**SO ORDERED.**

Dated:    December 21, 2023
              Central Islip, New York

_____
/s/ JMA
JOAN M. AZRACK
UNITED STATES DISTRICT JUDGE